**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | |
|---|---|
| Marc Van Wechel, | ) |
| | ) |
| Plaintiff, | ) **ORDER RE CROSS-MOTIONS FOR** |
| | ) **SUMMARY JUDGMENT** |
| vs. | ) |
| | ) |
| Carolyn W. Colvin, Acting Commissioner | ) |
| Social Security, | ) Case No. 4:12-cv-159 |
| | ) |
| Defendant. | ) |

The plaintiff, Marc Van Wechel, seeks judicial review of the Social Security Commissioner's denial of his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 ("Act"). The case was referred to the undersigned for final disposition by consent of the parties.

## I. BACKGROUND

### A. Procedural history

Van Wechel filed an application for disability insurance benefits on July 31, 2009, alleging he has been disabled and unable to work since March 3, 2009. (Tr. 10, 132-135). His applications were denied initially and upon reconsideration. (Tr. 70-72, 70-76). At his request, an administrative law judge ("ALJ") convened a review hearing on June 14, 2011. (Tr. 24-63, 78-100).

The ALJ issued his written opinion on August 18, 2011, concluding that Van Wechel was not disabled as defined by the applicable regulations and therefore not entitled to disability insurance benefits. (Tr. 10-19). Dissatisfied, Van Wechel appealed the ALJ's decision to the Appeals

1

Council. (Tr. 121). Upon completion of its review, the Appeals Council denied Van Wechel's appeal and adopted the ALJ's decision as the Commissioner's final decision. (Tr. 1-6).

Van Wechel initiated the above-captioned action on November 21, 2011, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (Doc. No. 1). He filed a Motion for Judgment on April 8, 2013. The Acting Commissioner subsequently filed her own Motion for Summary Judgment on May 3, 2013. (Doc. Nos. 10 & 16). Both motions have now been fully briefed and are ripe for the court's consideration.

### B. General background

Van Wechel stands five feet, five inches tall. (Tr. 28). At the time of his administrative hearing he was 45 years old and weighed 187.9 pounds. (Tr. 29). He has obtained his GED. (Tr. 31). He has not engaged in substantial gainful activity since July 31, 2009, the alleged onset date of his disability. In the fifteen years preceding the alleged onset date, he worked as an equipment operator, a construction laborer, "locator technician," tow truck operator, and yard hand. (Tr. 34-36, 156, 163, 186-209). Since the alleged onset date he has helped out on brother-in-law's farm. (Tr. 176, 211, 229).

Van Wechel suffers from obesity, asthma, allergies, and type 1 diabetes mellitus. He has also been diagnosed with chronic obstructive pulmonary disease ("COPD"). He takes two types of insulin, Humalog and Lantus, to manage his diabetes. To address his allergies and asthma, he uses an Albuterol inhaler as needed. He reportedly has lost grip strength and some dexterity in his hands following carpel tunnel surgery in February 2008. (Tr. 260). He has also complained of shoulder pain, facial pain, cramping in his hands, headaches, and fatigue. He has reported that his pain can

2

last anywhere from a few hours to all day. (Tr. 227). For relief, he has relied primarily upon over-the-counter pain killers. (Tr. 228).

### C. **Medical Records**

Van Wechel presented to the Meritcare Hospital's emergency room in Fargo, North Dakota, on May 26, 2008, after running out of Humalog. (Tr. 244). The examining physician wrote him a prescription and advised him to follow up with his regular doctor as needed. (Id.).

Van Wechel reported to the Merit Care walk-in clinic on August 21, 2008, to get his Humalog, Lantus, and Albuterol refilled. (Tr. 241-42). According to the treatment notes, he was irritable but did not appear to be in any distress. (Id.). He was given a weeks worth of his medications and advised to follow up with his primary care physician. (Tr. 242).

Van Wechel's medical records indicate that over the next three months he twice sought treatment at the Craven-Hagen Clinic in Williston, North Dakota. (Tr. 257). Specifically, they reveal that on October 1, 2008, he presented to the clinic with complaints of shortness of breath and a cough. (Tr. 258). They also reveal that he returned to the clinic on December 29, 2008, with similar complaints. (Tr. 259). On each occasion he was prescribed Advair and advised to continue using Albuterol as needed. (Tr. 258-59).

More than a year passed until Van Wechel again sought treatment, this time at the Tioga Medical Center. (Tr. 277). According to the center's records, he presented on April 7, 2010, because he had again run out of insulin. (Id.). A diabetic panel ordered by the attending physician revealed that his diabetes was not well controlled. (Tr. 27-74, 277).

On April 14, 2010, Van Wechel presented to Dr. Nuzhat un Nisa for his Social Security Determination Physical. (Tr. 260). He reported that he had quit working in March 2009 secondary

3

to a problem with his insulin and work schedule, that his blood sugars "were tremendously high and uncontrolled," and that he had multiple insulin reactions. (Id.). He also reported that his vision was progressively deteriorating, that he "gets short of breath very easily," and that he had noticed a loss in grip strength following his for carpal tunnel surgery in February 2008. (Id.). He denied any numbness and tingling in his extremities. (Id.). On examination he exhibited full strength in his upper and lower extremities, normal reflexes, and a gait within normal limits. (Id.). He had some difficulty changing positions from sitting to standing but nevertheless was able to get on and off the examination table. (Id.). His grip strength was "40 in left hand and 30 in right hand" and he "was able to make fist and was comfortable holding a pencil and small objects." (Id.).

Van Wechel returned to the Tioga Medical Center on May 7, 2010. (Tr. 276). He reported that his blood glucose levels had been stable, that he was taking his medications, and that he had been working on diet and exercise. (Id.).

Van Wechel next returned to the Tioga Medical Center on June 30, 2010, to discuss smoking cessation. (Tr. 278). He was counseled and given a prescription for Chantix. (Id.).

Van Wechel next presented to the Tioga Medical Center on May 3, 2011, complaining that he had felt bloated for the past week and was experiencing shortness of breath. (Tr. 280-81). A CT scan of his abdomen revealed that he was suffering from significant constipation. (Tr. 280).

Van Wechel returned to the Tioga Medical Center on May 13, 2011, with continued complaints of a distended abdomen and shortness of breath. (Tr. 279). He also reported that his diabetes was out of control. (Id.).

Van Wechel presented to the Dr. Bilal Ahmed at the Mid Dakota Clinic on June 6, 2011. (Tr. 288). Based upon anecdotal evidence, Dr. Ahmed concluded that Van Wechel's blood sugar

4

levels were fluctuating and low. (Tr. 289). In the process of reaching this conclusion Dr. Ahmed was careful to note that Van Wechel was "not very compliant with his diet" and was not adjusting his mealtime insulin according to his carbohydrate intake. (Id.). In addition to setting Van Wechel up to see educators, Dr. Ahmed appears to have referred him to a pulmonologist. (Id.).

Subsequent medical records appear to indicate that Van Wechel was examined by pulmonologist in the Fall of 2011.[1] Van Wechel followed up with Dr. Jeffrey Verhey, on April 2, 2012. (Tr. 293-95). According Dr. Verhey's clinical notes and correspondence, Van Wechel suffered from an Alpha 1-antitrypsin deficiency and COPD. (Tr. 293-94). He started Van Wechel on bronchodilators, including Symbicort. (Tr 294).

### D. Other Evidence

Van Wechel's sister, Georgia Eklund, has reported that his diet is poor, his diabetes is getting worse, he has problems with his hands, and that he has trouble breathing. (Tr. 211-217).

### E. Administrative hearing testimony

Two people testified at the administrative hearing: Van Wechel and a vocational expert. (Tr. 25-63). The ALJ examined Van Wechel first. (Tr. 25). At the outset of his examination, the ALJ questioned Van Wechel about his reading, writing, math, and money management skills. (Tr. 30-32). Van Wechel responded that while he could read, he had difficulty maintaining his focus for extended periods of time. (Tr. 31-32). He further testified that he had lost some dexterity and feeling in his hands following carpel tunnel surgery, making it difficult to write longer than twenty seconds without taking a break. (Tr. 32). As for his ability to perform simple math and manage his money, he assured the ALJ that he was capable. (Tr. 32).

---

[1]Medical records and correspondence dated April 2, 2012, contain references to pulmonary function tests or PFTs from September 1, 2011. (Tr. 293-94).

5

The ALJ's next line of inquiry was about Van Wechel's work history. Van Wechel testified that he had last worked in the oil field from August 2008 until he was laid off in March 2009. (Tr. 33). He further testified that he had applied for and received unemployment benefits for approximately one year following his termination, that he was currently looking for work, and that he had sought assistance from Williston Job Service. (Tr. 33-34).

When asked by the ALJ whether he felt capable of performing any of his past work, Van Wechel responded that he could not on account of his diabetes and the constant breaks he required to monitor it. (Tr. 36). He went on to explain that he typically checks his blood sugars a minimum of three to four times a day, that spikes in his blood sugar leave him feeling very lethargic and irritable, and that he feels anxious and when his blood sugar dips too low. (Tr. 37-39). When asked whether, his diabetes aside, there was anything else preventing him from working, he advised that he could not walk very far and had difficulty breathing. (Tr. 40).

The ALJ next asked Van Wechel about how he occupies his time, to which Van Wechel testified that he had limited social interaction and spent his day searching for work online, playing "World of Warcraft" on his computer, napping, reclining, and watching television. (Tr. 46-47, 50). Upon additional inquiry, he acknowledged that was able to care of his personal needs, take out the garbage, and prepare meals using the microwave. (Tr 47-48). However, he advised that he no longer drove, had problems with buttons, could only lift 5 to 10 pounds, could not walk more than a block before he needed to rest, could stand for a maximum of 15 to 20 minutes at a time, and could sit 45 minutes at a time. (Tr. 48-50).

At the ALJ's prodding, Van Wechel further elaborated on the effects of conditions. For example, he testified that he had difficulty adhering to a fixed schedule, that he felt his eyesight was

6

diminishing over time, and that he had been experiencing chronic headaches. (Tr. 52-54, 56). He also testified that had been experiencing occasional numbness and tingling in his lower extremities for the past ten years. (Tr. 54). When confronted by the ALJ over the fact he had told the consultive examiner that he had not been experiencing any such numbness or tingling, he responded that he did not like doctors, that he just wanted to get out of the examiner's office, and that he did not feel as if the examiner would do anything for him. (Tr. 54-55).

At the conclusion of Van Wechel's testimony, the ALJ posed the following three hypotheticals to the vocational expert ("VE"): (1) whether an individual possessing Van Wechel's vocational profile and the residual functional capacity outlined in the state agency's assessment could perform Van Wechel's past relevant work; (2) whether an individual could perform Van Wechel's past relevant work if he possessed Van Wechel's vocation profile and (a) could lift 10 pounds frequently and 20 pounds occasionally, (b) could sit for 6 hours a day, (c) could stand and/or walk on even terrain for 6 hours a day, (d) was precluded from operating vibrating hand tools, (e) had some postural limitations, (f) and needed to avoid concentrated exposure to pulmonary irritants; and (3) whether an individual could perform sedentary work if he possessed Van Wechel's vocational profile and limitations. (Tr. 57-60). The vocational expert responded that the person described in the first hypothetical could perform Van Wechel's past relevant work. (Tr. 58). As for the person described in the second hypothetical, he testified that this person would not be able to perform Van Wechel's past relevant work but would be able to perform light, unskilled jobs. (Tr. 59). Finally, with respect to the third hypothetical, he testified that such a person would be capable of performing unskilled sedentary work. (Tr. 60-61).

7

On cross examination, the vocation expert acknowledged that an individual would be precluded from performing all competitive work if he was absent 3-5 times per month, only had occasional feeling, and "needed to alternate lay downs and elevate feet 40 to 60 percent out . . . of an eight our day." (Tr. 61-62).

### F.    ALJ's decision

The ALJ issued his written opinion denying Van Wechel's application for disability insurance benefits on August 19, 2011. (Tr. 11-19). When reviewing the application, the ALJ employed the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520. He quickly dispensed with the first step, acknowledging that Van Wechel had not engaged in substantial gainful activity since March 3, 2009, the alleged onset date of his disability. (Tr. 11).

At the second step of his analysis, the ALJ acknowledged that Van Wechel suffered from the following severe impairments: obesity; type 1 diabetes; asthma/emphysema/seasonal allergies; and a history of carpel tunnel syndrome (status post bilateral carpel tunnel release). (Tr.12).

Moving on to the third step of his analysis, the ALJ compared Van Wechel's impairments to the presumptively disabling impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 12-13). He concluded that none of Van Wechel's impairments were of listing level severity. (Id.).

At the fourth step of his analysis, the ALJ assessed Van Wechel's residual functional capacity, that is, his ability to do sustained work-related physical and mental activities in a work setting on a regular basis. Based upon his review of the evidence, the ALJ made the following determination:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1467(b) except he can frequently but not constantly engage in handling, finger, and feeling with the bilateral hands, and occasionally engage in push/pull actions with the bilateral lower extremities. The claimant can climb

>
> ramps/stairs, balance, stoop, kneel and crawl, but should avoid concentrated exposure He found that Van Wechel's medically determinable impairments could reasonably be expected to produce the alleged symptoms.

(Tr. 14). In so doing, he acknowledged that Van Wechel's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. (Id.). However, he questioned the credibility of Van Wechel's statements regarding the intensity, persistence, and limiting effects of his symptoms. (Id.). Specifically, he observed: (1) Van Wechel's descriptions of his daily activities were internally inconsistent; (2) Van Wechel's oxygen saturation remained in the mid-to-high ninetieth percentile despite his complaints of shortness of breath; (3) Van Wechel was less than diligent in his efforts to manage his diabetes but nevertheless appeared able to keep his diabetes under control when compliant with his course of treatment; and (4) there was nothing in the record to suggest Van Wechel had ever complainted to his physicians about a alleged lack of dexterity or feeling in his hands. (Tr. 14-16). Finally, he stressed that Van Wechel's work had not ended due to any alleged medical issues. (Tr. 15-16).

The ALJ discounted statements made by Van Wechel's sister, Georgia Eklund, in a "third party adult function report and pain questionnaire," reasoning that her lack of medical training rendered her some of her observations suspect, that she was not entirely objective, and that her statements were not consistent with the preponderance of the objective medical evidence. (Id.).

Moving on to the fifth and final step of his analysis, the ALJ recognized that Van Wechel's condition rendered him incapable of perform past work. (Tr. 17). He did, however, feel that Van Wechel remained capable of performing a full range of light, unskilled light work in light of his age, education, experience, and residual functional capacity. (Tr. 17). As a consequence, he concluded that Van Wechel was not disabled as defined by Social Security Act. (Tr. 18).

9

## II. GOVERNING LAW

### A. Standard of review

The scope of this court's review is limited in that it is not permitted to conduct a *de novo* review. Rather, the court looks at the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence. Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." Id. Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion. Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole. See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993). The Eighth Circuit has stated, "Our

touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. Ellis v. Barnhart, 392 F.3d at 993.

### B. Law governing eligibility for adult benefits

An individual shall be considered to be disabled for purposes of DIB and SSI if the person is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. E.g., Hilkenmeyer v. Barnhart, 380 F.3d 441, 443 (8th Cir. 2004); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)[2] and determine:

(1) whether the claimant is presently engaged in a substantial gainful activity,

(2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

---

[2] The provisions in 20 CFR Part 404 apply to DIB and the provisions in Part 416 apply to SSI benefits.

(4) whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth or fifth steps, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945. The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id. In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[3] E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005). Claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. Pearsall v. Massanari, 274 F.3d at 1218.

### III. MOTIONS FOR SUMMARY JUDGMENT

Van Wechel maintains that the ALJ erred both in his evaluation of the evidence and as a matter of law. In so doing, he asserts that ALJ improperly discounted evidence and otherwise

---

[3] The Polaski factors are now embodied in 20 C.F.R. §§ 404.1529, 416.929.

ignored critical evidence when reaching his decision. Specifically, he complains the ALJ "cherry picked" evidence and otherwise ignored a number of his impairments when assessing his credibility, gave lay witness statements short shrift, relied on a RFC assessment that lacked substantial evidentiary support, and failed to incorporate all of his limitations when framing hypotheticals for the vocational expert.

A. **Credibility assessment**

Van Wechel maintains that the reasons given by the ALJ to discount his testimony are not supported by the record as a whole. He claims the ALJ failed take into consideration his carpal tunnel syndrome and resulting loss of dexterity, frequent and incapacitating headaches, reliance on inhalers, and past insulin reactions and that his subjective complaints are borne out by the objective medical evidence. These arguments, however, are without merit.

As for the objective medical evidence, the ALJ noted the following: Van Wechel's had only sporadically sought treatment for his diabetes (he had two periods where he did not receive any treatment for almost a year), that he was often noncompliant with his treatment, and that he demonstrated an ability to control his diabetes in those brief instances when he complied with treatment. (Tr. 14-16). In regards to his carpel tunnel syndrome, other than a notation that he had undergone surgery, there was nothing in the record suggestive of any further treatment let alone complaints about losses in dexterity. In contrast, during a consultative examination performed by Dr. Nisa in April 2010, Van Wechel had demonstrated excellent muscle strength in his extremities, an ability to make a fist, and the ability to comfortably hold small objects. (Tr. 15). Van Wechel's work history also indicated that, following his surgery, he had held a number of jobs that involved the use of his hands. (Id.). As for Van Wechel's assertion that the ALJ failed to give consideration

13

to his frequent and incapacitating headaches, it is specious; the only record of any headaches in the medical records are Van Wechel's denials of every having them. (Tr. 276-77).

The ALJ then made the following findings after consideration of the medical evidence and Van Wechel's testimony regarding his subjective symptoms and limitations:

> Although claimant has described limited daily activities, the objective medical evidence does not provide support for such alleged limitation. In addition, the nature and extent of his admitted level of daily activities is internally inconsistent with most of his subjective complaints. As noted, since the alleged onset of disability, the claimant has been able to attend to his personal care needs, cook his meals, clean his house, make his bed, take out the garbage, wash the dishes, do his laundry, mow the lawn, perform yard work, and drive a car. More telling the claimant testified that he enjoys playing video games, which involves concentration and the use of both hands on a sustained basis. Further the claimant stated that he helped his brother-in-law with work on the farm, including feeding the cattle. Again such work requires physical labor and use of the hands at a level inconsistent with subjective complaints and alleged limitations. Finally , the claimant states he uses the computer to perform his shopping and is able to manage his own finances. These activities are fully consistent with the residual functional capacity. He further testified that he received his GED, and can speak and write in English [Citation Omitted].
>
> In favor of his credibility, he has a positive work history and earning record. However, a number of factors erode the degree of probative weight that can be afforded to the credibility of the allegation of disability by virtue of his work profile. First, the claimant's last job ended not due to any of his alleged medical problems/complications but rather because he was laid-off from work. Second, the claimant applied for and received unemployment compensation benefits for a year, with the benefits of ending in June of 2010. While never a negating factor in terms of the ultimate issue of disability, the receipt of unemployment benefits during an alleged period of disability is one factor that is not consistent with the allegation of disability.

(Tr. 15).

Given the foregoing, Van Wechel's argument that the ALJ improperly discounted his testimony are without merit. Contrary to his assertions, the ALJ did consider the objective medical evidence and weighed that in conjunction with his testimony of his subjective symptoms and limitations. Further, the ALJ's analysis included a detailed discussion of a number the <u>Polaski</u>

14

factors and his determination that Van Wechel's subjective allegations were not consistent with the medical evidence is supported by the record. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (stating that failure to seek medical treatment for alleged impairments contradicts claimant's subjective complaints); cf. 20 C.F.R. § 404.1508 ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]"); see also Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (noting the ALJ' consideration of, amongst other things, a claimant's failure to diligently seek medical care); Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility.").

### B. Consideration of lay witness statements

Van Wechel next asserts that the ALJ gave short shrift to statements submitted by his sister, Georgia Eklund, regarding his medication conditions and functional limitations. This too is not borne out by the record. The ALJ expressly considered Ms. Eklund's statements but declined to give them substantial weight based on her lack of neutrality and medical training and, more significantly, his conclusion that her statements, like Van Wechel's, were not consistent with the preponderance of the objective medical evidence. (Tr. 16). Since there is support in the record for the reasons given by the ALJ, this court must defer to ALJ's weighing of this evidence under the authority previously cited.

### C. RFC assessment

Van Wechel next asserts that ALJ's RFC assessment lacks substantial evidentiary support. His primary contention is that the ALJ improperly relied upon an assessment of a non-examining physician consultant who evaluated Van Wechel's residual function capacity and was of the opinion

15

that Van Wechel had the ability to perform medium work. (Tr. 262-269). This argument also lacks merit.

Here, it is clear that the ALJ did not rely exclusively upon the opinion of the non-examining consultant in making his RFC determination. While concluding the opinion was consistent with the record as a whole, the ALJ, nevertheless, gave Van Wechel the benefit of the doubt and found him capable of performing only a reduced range of light work. In so doing, he obviously relied upon the other record evidence, including Van Wechel's subjective complaints, Ms. Eklund's statements, and the objective medical evidence. (Tr. 16).

Given the foregoing, there was no error. See Gates v. Astrue, 627 F.3d 1080, 1082-83 (8th Cir. 2010) (an ALJ can consider the opinions of a nonexamining medical expert); Moore v. Astrue, 572 F.3d 520, 523-24 (8th Cir. 2009) (the ALJ did error in relying upon the opinion of a nonexamining consultant in determining the claimant's RFC when there was no contrary RFC by another physician, treating or otherwise); 20 C.F.R. § 404.1527(e) (opinions of nonexamining sources); see also Chapo v. Astrue, 682 F.3d 1285, 1288 (10th Cir. 2012) ("[I]f a medical opinion adverse to the claimants has properly been given substantial weight, the ALJ does not commit reversible error by electing to temper its extremes for the claimant's benefit.").

### D. Hypotheticals posed by the ALJ

Finally, Van Wechel takes issue with the hypotheticals posed by the ALJ to the vocational expert. Specifically, he asserts that the ALJ erred to the extent that the ALJ's hypotheticals did not incorporate "claimant's need to nap; inability to maintain someone else's schedule; excessive absenteeism; frequent and or unscheduled breaks; limited concentration and an inability to keep to a pace set by another . . . ." (Doc. No. 13).

16

Van Wechel did not explicitly identify the basis of his aforementioned limitations. Presumably, they are premised either on his testimony or Eklund's statements. However, as discussed above, the ALJ reasonably discounted both and thus had no duty to include limitations he found not credible in the hypothetical question to the vocational expert. E.g., Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006) (quoting Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir.1994)) ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."); Forte v. Barnhart, 377 F.3d 892, 897 (8th Cir. 2004).

Here, the ALJ posed a hypothetical question to the vocational expert that included all the limitations he found credible and that were included in his residual functional capacity assessment. As a result, the vocational expert's testimony is substantial evidence supporting the ALJ's finding at step five that Van Wechel can perform work that exists in significant numbers in the national economy. See Lacroix, 465 F.3d at 889; Sultan, 368 F.3d at 864.

## IV. CONCLUSION AND ORDER

For the reasons stated above, Van Wechel's Motion for Summary Judgment (Doc. No. 12) is **DENIED**, the Commissioner's Motion for Summary Judgment (Doc. No. 15) is **GRANTED**; and the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Dated this 25th day of March, 2014.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr., Magistrate Judge
United States District Court